**UNITED STATES of America, Plaintiff,**

v.

**Gene Z. HANRAHAN, William T. P. Shea and John W. Tynan, Defendants.**

**Cr. No. 269–62.**

United States District Court
District of Columbia.

June 24, 1966.

Donald S. Smith, Asst. U. S. Atty., for the United States.

Charles B. Murray, Washington, D. C., for defendants Hanrahan and Shea.

Myron G. Ehrlich, Washington, D. C., for defendant Tynan.

## OPINION

SIRICA, District Judge.

The defendants herein were convicted by a jury of violations of the federal mail fraud statute,[1] and were sentenced to a term of imprisonment of from twenty months to five years. From that judgment they appealed. The United States Court of Appeals for the District of Columbia Circuit remanded the cause for a hearing to determine certain matters relating to the defendants' right to a speedy trial as guaranteed by the Sixth Amendment, and as to whether unnecessary delay in bringing the prosecution against the defendants requires a dismissal of the case under Rule 48(b).[2] Hanrahan v. United States, 121 U.S.App. D.C. 134, 348 F.2d 363 (1965).

The defendants were first indicted in the United States District Court for the District of Puerto Rico. The indictment charged these defendants and seven other persons in sixty-five counts with fraudulent mailings to Puerto Rican citizens pursuant to a scheme to defraud. Three months after the indictment was returned, the defendants filed a motion for change of venue, alleging that prejudicial pretrial publicity made a fair trial in Puerto Rico impossible, and that most of their witnesses lived in the continental United States and that the defendants were without funds to bring these witnesses to Puerto Rico for trial. Some months later, this motion was granted and the case was transferred to the United States District Court for the District of Columbia. Subsequently, the United States indicated to the Court that it intended to dismiss the Puerto Rican indictment and to seek a new indictment before a grand jury in the District of Co-

---

1. 18 U.S.C. § 1341.

2. Fed.R.Crim.P. 48(b).

lumbia. Between this announcement and the return of the indictment under which the defendants were convicted, some seventeen months elapsed.

The hearing on remand was held by this Court commencing on March 4, 1966, and continued from time to time until May 20, 1966. The defendants were present at the hearing, and along with the United States, were represented by able and experienced counsel. This hearing was directed at seeking answers to two questions which the Court of Appeals found unanswered by the voluminous trial record: (1) Did the prosecutor exercise reasonable diligence in seeking the second indictment; and (2) since the mailings took place in the District of Columbia, and the scheme was centered there, why was the prosecutor's discretion exercised in first bringing the case in Puerto Rico instead of the District of Columbia? Testimony of five witnesses totalling approximately twelve hundred typed pages, plus affidavits and documents were presented to the Court along with citations to the original trial record and proposed findings of fact and conclusions of law.

## I. *The Puerto Rican Case*

On or about February 12, 1959, Postal Inspector Stohlberg visited Mr. Francisco A. Gil, Jr., United States Attorney for the District of Puerto Rico, and brought to his attention numerous complaints concerning the activities of the Commercial Finance Service Corporation in Puerto Rico. Mr. Gil was, at that time, familiar with a circular issued from the Office of the Attorney General of the United States dealing with the so-called advance fee racket, and after examining the evidence presented to him by Inspector Stohlberg, he determined that Title 18, U.S.C. § 1341 had been, and was being, violated by agents of the Commercial Finance Service Corporation. He further determined that the victims of these offenses were what he considered poor persons. For these reasons, he authorized the filing of a complaint and the issuance of arrest warrants. The complaint was filed on February 13, 1959, with the United States Commissioner for the District of Puerto Rico, charging the defendant Shea and six other persons not now before the Court, with violations of 18 U.S.C. § 1341. The warrant for the arrest of defendant Shea was never executed and was returned to the United States Commissioner.

The United States Attorney in Puerto Rico received the final report from the Postal Inspector about six weeks following the arrests of agents of the Commercial Finance Service Corporation in Puerto Rico. On June 30, 1959, the defendants filed a motion to dismiss the Commissioner's proceedings against them. One of the grounds therefor was an alleged denial of a speedy trial, although the motion was unsupported by any factual allegations or citation of authority. Subsequently, on July 22, 1959, and although defendants' counsel had expressed a desire to waive indictment and proceed by way of information, an indictment was returned in the United States District Court for the District of Puerto Rico which charged these defendants and others in sixty-five counts with violations of the mail fraud statute. This matter had been presented to the grand jury by the United States Attorney in approximately one day. All of the counts of the Puerto Rican indictment charged violations which were within the applicable statute of limitations.[3] None of the present defendants had been arrested up to the date of the return of the indictment. On July 28, 1959, defendants Hanrahan and Shea surrendered themselves in the United States District Court for the District of Puerto Rico and were enlarged upon bond the same day. They were arraigned the following day and entered pleas of not guilty. Defendant Tynan was arrested in the State of Maryland on July 28, 1959, and was released on bond the same day. Defendant Tynan was never arraigned during the pendency of the case in Puerto Rico. At their ar-

3. 18 U.S.C. § 3282.

raignment, counsel for Hanrahan and Shea moved for a trial as soon as possible. The Court declined to grant the motion on the ground that it could not set a trial date until all of the defendants were produced and arraigned.

On August 28, 1959, the defendants, through counsel, filed a motion for a bill of particulars. The bill of particulars was filed by the government on October 13, 1959. On September 21, 1959, the case was scheduled for trial on November 16, 1959. However, on October 28, 1959, the defendants filed a motion for change of venue, and on November 3, they also moved for a continuance of the trial date, alleging that the case was complicated and that they would be unable to prepare it for trial within such a short period. The motion was granted on November 4, 1959, and the trial date was continued until March 28, 1960. There is no indication that the defendants, or the government, sought a hearing on the defendants' motion for change of venue. On November 6, 1959, the Court entered an order continuing the hearing on this motion until further order. On February 10, 1960, the defendants filed their second motion for a continuance, requesting a delay until June, 1960. The grounds for this motion were that counsel would not be available until May; that the defendants were as yet still unprepared; and that they would be in a better position to defray expenses if the trial was held in the summer months. On March 14, 1960, this motion for a continuance was granted, and the trial was set for June 6, 1960. On May 2, 1960, the Court entered an order setting the pending motions, including the motion for change of venue, for a hearing on May 12, 1960. On May 9, 1960, the defendants moved for a further continuance of the trial date on the ground that their attorney would necessarily be in the continental United States until the end of June, 1960. The United States filed a formal opposition on the following day.

On May 12, 1960, a hearing was held on the defendants' motion for change of venue. The Court noted that the defendants would undoubtedly be subject to some local prejudice in Puerto Rico, indicating that it did not know whether the passage of time from the publication of the newspaper articles would have allowed their influence to subside or disappear. The Court, observing that the newspaper articles brought out the contentions of both the prosecution and the defense, as to the legitimacy of the business that had been conducted, took the defendants' motion under advisement. On May 24, 1960, an order was entered granting the defendants' motion for change of venue. As the basis for its ruling, the Court mentioned the newspaper publicity which had taken place about the time of the defendants' arrest in Puerto Rico, and also noted that the majority of the jurors would probably be occupied in trades, businesses, etc., similar to those of the alleged victims. The Court also recognized the defendants' precarious financial condition and the fact that most of the witnesses they intended to call lived or had their offices in Washington, D. C., in the vicinity of Washington, D. C., or elsewhere on the mainland.

It is the defendants' contention that the prosecution in Puerto Rico was under the direction and control of the Department of Justice and that the case was brought in that District in order to take advantage of the situation which existed there, and to put the defendants at a disadvantage in the presentation of their defense.

The exhibits and testimony indicate that there was considerable correspondence between the United States Attorney in Puerto Rico and the Department of Justice. In addition, Mr. Gil testified that he participated in eight or ten conferences, including telephonic communication, with the Department concerning the case. On May 28, 1959, the Department informed Mr. Gil that they were concerned that there be no more delays before presenting the case to the grand jury, and offered their assistance to him. On the following day, Mr. Gil called the

Department of Justice and indicated that because of his crowded work schedule, he would welcome assistance in preparing the indictment. Subsequently, sample indictments were furnished by the Department, and Mr. Gil was requested to forward by air mail a copy of the indictment he would use. Upon receipt of this indictment, the Department indicated to Mr. Gil that it had doubts about portions of it, but before a revised copy could be prepared by the Department, the indictment was filed in Puerto Rico. In addition to cooperation in the preparation of the indictment, there was correspondence between the United States Attorney and the Department of Justice regarding the defendants' desire to waive indictment; opposition to the motion for change of venue and other offers of assistance.

It is apparent to the Court that the Department of Justice was interested in the prosecution of mail fraud schemes in general, and in this case in particular, in conjunction with the Attorney General's program to eradicate consumer frauds. However, the United States Attorney for the District of Puerto Rico had the authority to initiate prosecutions for violations of federal statutes which were taking place in Puerto Rico, and at no time prior to his authorizing the filing of the complaint and the issuance of the arrest warrants in this case, did Mr. Gil consult with any official of the Department of Justice. Furthermore, although the Post Office Department was conducting an investigation of the defendants and their activities in the continental United States prior to the time the defendants began their operations in Puerto Rico, it is apparent that Mr. Gil did not learn of this investigation until immediately before he presented his case to the Puerto Rican grand jury, and that at that time the investigation of continental cases had not been completed. It is the Court's conclusion, based on the foregoing, and upon the whole record of this case, that the decision to bring the prosecution in the United States District Court for the District of Puerto Rico was an independent judgment by the United States Attorney, and that in so deciding, he was not controlled by the dictates of the Department of Justice.

The further question remains: Why did the prosecutor choose to bring the action in Puerto Rico? As indicated, it is the defendants' position that this was done to take advantage of supposed local prejudice and to place the defendants at a disadvantage, that is, that the decision was a deliberate choice made for a supposed advantage. The Court does not feel that this inference can be drawn from the evidence. On or about February 13, 1959, the agents of Commercial Finance Service Corporation operating in Puerto Rico had already collected more than $20,000 pursuant to their activities. It was apparent that a federal statute had been, and was then being, violated and that the residents of the district were being victimized. Furthermore, the continental investigation, of which the prosecutor later became aware, had not yet been completed, while the investigation of Puerto Rican cases was completed within two months after the warrants were issued. It is reasonable to assume that when he did become aware of this investigation he felt that a trial on the Puerto Rican charges would be more feasible under the circumstances, than waiting for the completion of the investigation in the continental United States. Furthermore, as subsequent events would indicate, a trial in Puerto Rico on the Puerto Rican charges could possibly have taken place prior to a trial in the District of Columbia on the same charges. In the last analysis, it appears to this Court that the prosecutor felt that it was his duty to stop a continuing offense whereby residents of his district were being victimized. There is no indication that this decision was reached in utter disregard for the defendants' rights. In the opinion of this Court, the prosecutor would have been derelict in his duty if he had not moved swiftly, as he did.

For the foregoing reasons and on the basis of the entire record in this case, the Court is of the opinion that the ex-

ercise of discretion in bringing the prosecution in Puerto Rico was proper, and that it was not a deliberate choice made for a supposed advantage.

## II. *The Prosecution in the District of Columbia*

■ The pleadings, bonds and photostatic copies of docket entries were transmitted from the Clerk of the United States District Court for the District of Puerto Rico on June 1, 1960, and arrived in the office of the Clerk of the United States District Court for the District of Columbia on June 3, 1960. The United States Attorney for the District of Columbia was notified of the transfer of the case on June 14, 1960, and on June 23, 1960, the matter, designated Criminal Case No. 510–60, was assigned to Assistant United States Attorney Harry T. Alexander, by the Chief of the Criminal Division of the United States Attorney's Office. On June 28, 1960, Mr. Philip F. Herrick entered his appearance as attorney for the instant defendants and four others. On July 1, 1960, several defendants, other than the present ones, filed a motion to continue arraignment until the first day of trial. On July 6, 1960, Mr. Alexander filed an opposition to this motion indicating that the presence of all defendants before the Court would enable the Court to fix a trial date agreeable to all and eliminate further requests for a continuance. On July 5, 1960, the defendants' motion was denied and the Court ordered that the arraignment of defendant Tynan, and four co-defendants who had not been previously arraigned in Puerto Rico, be set for August 5, 1960.

At the arraignment, the government requested that the trial be set for some time in January, 1961. The defendants opposed this, urging their Constitutional right to a speedy trial. The Court tentatively set the case down for trial on October 10, 1960. On August 12, 1960, the government moved again to have the case set for trial in January, 1961, and in their opposition, the defendants again demanded a speedy trial. These demands for a speedy trial are interesting, especially in view of the fact that at least until February 10, 1960, the defendants were not prepared for trial in Puerto Rico, and that they were unable to go to trial there as late as June, 1960, although upon arraignment in Puerto Rico on July 29, 1959, they had demanded a trial as soon as possible. During the pendency of the case in Puerto Rico, the United States Attorney made no motions for a continuance of the trial and was responsible for none of the delay between the return of the indictment and the change of venue.

Upon the request of the Department of Justice, the United States Attorney's office files were transferred from Puerto Rico to Washington, D. C. on July 23, 1960. The exhibits pertaining to the case were received by Assistant United States Attorney Alexander on August 3, 1960. On July 1, 1960, Mr. Alexander discussed the case with officials from the Department of Justice. At this time, he raised the question of certain "mechanical problems," originally suggested by defense counsel, which might make it difficult to bring the Puerto Rican case to trial in the District of Columbia. At the time, however, these problems did not appear insurmountable. It was Mr. Alexander's opinion that the Puerto Rican case could have been tried in October, had one had time to develop it.

On September 14, 1960, the government's motion that the trial be scheduled for January of 1961, came on for hearing. The case was then set for trial on November 1, 1960, in view of the defendants' desire for a speedy trial. In so doing, the Court indicated that it felt that the preparation which was done in Puerto Rico should not be wasted. On the next day, the United States Attorney for the District of Columbia informed Mr. Gil of the Court's ruling, and also told him that the Court indicated that his office should cooperate in the presentation of this case.

During the month of September, 1960, it had become apparent to the United States Attorney for the District of Co-

lumbia, and to officials of the Department of Justice, that the trial of the Puerto Rican indictment in the District of Columbia would present great problems. These difficulties were, for the most part, the "mechanical problems" suggested by defense counsel soon after the case was transferred, which at first blush did not appear insurmountable. These problems consisted mainly of the following: (1) Many of the documents to be used as evidence at the trial were in the Spanish language; (2) many of the witnesses to be called by the government could not speak English; (3) extensive use of interpreters would be necessary in the preparation and trial of the case; (4) the witnesses in the Puerto Rican indictment were largely poor persons and sole proprietors of small businesses and to bring them to the District of Columbia for the trial would work an undue hardship upon them; (5) many of the witnesses in the Puerto Rican indictment did not possess clothes to withstand the rigors of the winter in the District of Columbia, during which time the case was scheduled to be tried; and (6) the lack of a Spanish speaking prosecutor in the District of Columbia. These matters, along with the Court's ruling on the trial date, were discussed by Mr. Alexander and officials of the Department of Justice on September 16, 1960. It appeared then, that because Mr. Gil had personally prepared and presented the case to the Puerto Rican grand jury, and in view of the small staff available to run his office, it would not be practicable to expect the Puerto Rican United States Attorney, or his office, to assist in the trial. Furthermore, it appeared that the use of interpreters would be most undesirable because of the nature of the scheme involved. After a full discussion, the best solution appeared to be the possibility first raised on July 1, 1960, that is, to obtain a new indictment with continental witnesses. On September 29, 1960, conferences were held at the Department of Justice and at the Office of the United States Attorney for the District of Columbia to discuss the necessity of obtaining a new indictment. Present at these conferences were the United States Attorney for the District of Columbia, the United States Attorney for Puerto Rico, Messrs. Connor, Kossack, Arenson, and Barry of the Department of Justice, Assistant United States Attorney Harry T. Alexander, and Postal Inspectors Burrows and Callahan. It was decided that a new indictment would be sought thereby eliminating the language barrier and other difficulties inherent in attempting to prosecute the Puerto Rican indictment in the District of Columbia. The new indictment was to be based largely upon victims of the scheme residing within the continental United States. Postal Inspector Burrows indicated to Mr. Alexander that he had seventeen cases in the continental United States worked up and another one-hundred available. He was instructed to make a further investigation regarding continental victims. United States Attorney Gil was instructed to submit a report containing the names of Puerto Rican victims who spoke sufficient English to testify in that language and who would not be inconvenienced in coming to the District of Columbia to testify at the trial. At this conference, it was agreed that no extensive investigation appeared to be necessary at that time, and that the bulk of the investigative work had already been done. It was also agreed that the indictment to be sought should be more manageable than the one returned in Puerto Rico, preferably having one-half the counts of the Puerto Rican indictment.

On October 6, 1960, the Chief of the Criminal Division of the United States Attorney's Office indicated to the Chief Judge of the United States District Court for the District of Columbia, in chambers, that the government intended to dismiss the Puerto Rican indictment. On the same date, Mr. Alexander went to Philadelphia to interview defendant Silverman. This was the only time that Mr. Alexander interviewed any witness in the case. On October 7, when Mr. Alexander was out of town, the Chief of

the Criminal Division announced in Court that the government intended to dismiss the Puerto Rican indictment and present the matter to a grand jury in the District of Columbia. He further advised the Court that it was "anticipate[d] it will take approximately six weeks to present this matter to a new grand jury, that is, to thoroughly investigate it and present it." Mr. Alexander had no knowledge that this estimate would be made nor did he authorize it to be made in his behalf. On this date, the Chief of the Criminal Division was not familiar with the extent of the operations of the defendants in the United States, the amount of documentary evidence, the number of witnesses necessary to prove the scheme to defraud, or the complexity of the case, but gave an estimate based upon prior experience of his office.

On October 7, 1960, the matter was continued until December 8, 1960. The defendants objected to the continuance, indicating their desire to proceed with the case. With the consent of the defendants, the indictments against them were not dismissed on October 7, in order that the bond from the Puerto Rican indictment could be transferred to the new indictment. Subsequently, the indictment was dismissed as to Shea and Tynan on February 1, 1961, and as to Hanrahan on June 15, 1961.

Some time prior to October 12, 1960, and unknown to Mr. Alexander, the Department of Justice urged Postal Inspector Burrows to expedite his re-investigation of the continental witnesses. The United States Attorney hoped to have Burrows' report, as well as Department of Justice recommendations, within two weeks of October 12, 1960. On October 27, 1960, Mr. Gil transmitted to the United States Attorney for the District of Columbia his report of Puerto Rican victims who could come to the District of Columbia and testify at the trial. On December 31, 1960, Postal Inspector Burrows retired from the Postal Inspection Service, and on January 7, 1961, the case was assigned to Postal Inspector Joseph P. Turner. On January 11, the Department of Justice inquired of Mr. Alexander as to the progress of the investigation looking to re-indictment. Mr. Alexander said that he was waiting to hear from Postal Inspector Burrows. On January 13, Mr. Alexander advised the Department that Mr. Burrows had retired and had been replaced by another Inspector. He also indicated that he expected to spend two days during that week conferring with the new Inspector. At the hearing, Mr. Alexander was unable to recall whether he met Mr. Turner, or where he met him, but during the week of January 16, 1961, Postal Inspector Turner transmitted to Mr. Alexander the supplemental investigation regarding victims of the scheme residing in the continental limits of the United States.

From the period beginning May, 1960, and ending at the beginning of January, 1961, Mr. Alexander was carrying his normal heavy load of criminal cases, and at least between May and September, 1960, he substituted at trial, impromptu, for other Assistant United States Attorneys otherwise engaged or on sick leave. During January, February and March, 1961, the Chief of the Criminal Division was confronted with personnel problems in the operation of that Division. On January 29, 1961, Assistant United States Attorney Fred McIntyre resigned to accept appointment as Chief Counsel of a Committee of the United States Senate. During most of the period between February 3 and March 17, Assistant United States Attorney Harold Titus was absent on sick leave. Both of these men were senior trial attorneys in the Criminal Division and with their loss, it became necessary for the Chief of the Division to reassign their cases among the remaining personnel of the Criminal Division. He determined that because of the loss of Mr. McIntyre and the illness of Mr. Titus, it was necessary that Assistant United States Attorney Alexander continue to prosecute criminal cases set for trial on the regular court calendar.

On March 13, when the matter came before the Court, the Chief of the Crim-

inal Division indicated that the delay in presenting the case to the grand jury was due to the fact that he could not spare Mr. Alexander from the general trial work at that time. On March 23, 1961, the Department of Justice asked Mr. Alexander to advise the Department of the posture of the case since some time had elapsed since the transfer from Puerto Rico. A week later, the United States Attorney informed the Department that Mr. Alexander had been unable to devote much time to the case due to the fact that he had been engaged in trials practically every court day, but it was expected that he would be in a position to start presentation of the case to the grand jury within the next three weeks. On April 1, 1961, Mr. Alexander was assigned to work full time on the instant case. For the entire month of April, he reviewed and evaluated the evidence developed by the Postal Inspectors in preparation for presenting the case to a grand jury.

On April 27, 1961, a new United States Attorney entered on duty. Shortly after taking office, the United States Attorney advised the Chief of the Criminal Division that he was temporarily transferring Mr. Alexander to the Appellate Division of the office to prepare the briefs and to argue two cases of first impression involving the issue of insanity. These cases were Overholser v. O'Beirne, 112 U.S.App.D.C. 267, 302 F.2d 852 (1961) and Jenkins v. United States, 113 U.S. App.D.C. 300, 307 F.2d 637 (1962). The United States Attorney selected Mr. Alexander for these assignments because of his prior experience in the Appellate Division in cases on appeal involving insanity issues. In addition, there was a shortage of experienced personnel in the Appellate Division and the Chief of that Division had announced his resignation to be effective on May 21, 1961. The government's brief in Overholser v. O'Beirne was filed in the Court of Appeals on June 8, 1961, and the brief in Jenkins v. United States, was filed on June 23, 1961. The cases were argued by Mr. Alexander on June 27 and 28, 1961. In June, 1961, Mr. Alexander advised the United States At-

torney that he intended to resign as Assistant United States Attorney to take a position in the Department of Justice. His resignation was effective July 3, 1961.

At the time that Mr. Alexander was temporarily assigned to the Appellate Division, it was intended that he would return to the Criminal Division and continue to prepare this case for presentation to a grand jury. Between the date Mr. Alexander announced his resignation and July 3, 1961, the case was not reassigned to another Assistant United States Attorney because no Assistant United States Attorney was available to handle this case in either the Criminal Division or the Appellate Division.

Shortly after Mr. Alexander's resignation, the United States Attorney informed the Chief of the Criminal Division that he intended to request the Department to reassign the case to Mr. Alexander at the Department. On July 11, 1961, a letter containing this request was sent to Assistant Attorney General Herbert J. Miller. However, within two weeks subsequent to July 11, 1961, Mr. Acheson was notified that the instant case could not be reassigned to Mr. Alexander at the Department of Justice. Apparently, Mr. Alexander had been assigned to the investigation of the Bakers and Confectionary Union. Because of the complexity of that case, as well as the instant case, it was determined that Mr. Alexander could not work on the instant case.

Late in July, 1961, while visiting the Yale Law School, Miss Barbara A. Lindemann learned that the United States Attorney for the District of Columbia was seeking to hire an Assistant United States Attorney to prepare and prosecute the instant case. Shortly thereafter, Miss Lindemann, who had had experience in criminal fraud work, went to Washington, D. C. for an interview. At the interview, Miss Lindemann was advised that her primary duty upon appointment as an Assistant United States Attorney would be the prosecution of the instant case. At this interview, Miss Lindemann accepted the offer of appointment as As-

sistant United States Attorney, but was unable to enter upon duty immediately as requested by the United States Attorney because she had to move from New York City to Washington, and also because it was necessary that she have a security clearance from the Federal Bureau of Investigation before beginning work. Within the month following July 11, 1961, the United States Attorney advised the Chief of the Criminal Division that he had hired Miss Lindemann and that the instant case would be assigned to her for preparation and prosecution. Miss Lindemann entered on duty in the United States Attorney's Office on October 9, 1961. However, to avoid delay while waiting until she could be admitted to the Bar in the District of Columbia and until the United States Attorney's Office had the necessary budget to employ her, she started work on the case as a Special Assistant in the Department of Justice prior to her actually becoming an Assistant United States Attorney.

Shortly after October 9, 1961, Miss Lindemann contacted Postal Inspector Turner and requested that he assist her in the preparation of the instant case. She was advised by Inspector Turner that he was engaged in the preparation of another case which was then set for trial on November 15, 1961, and could not assist her. She received similar information from the Department of Justice when she indicated to the Department that she was trying to have the case ready for presentation to the grand jury on November 1, 1961, but had been unable to confer with Inspector Turner. Due to the unavailability of Inspector Turner, it was proposed by the Department of Justice that Postal Inspector Burrows be brought back from retirement to assist Miss Lindemann in the preparation of this case. Inspector Burrows commenced assisting Miss Lindemann on October 22, 1961.

On or about November 1, 1961, Postal Inspector J. C. Souder was assigned to assist Miss Lindemann and Inspector Burrows in the preparation of the case. Late in October, or early November, 1961, subpoenas *duces tecum* were served on the defendants for production of the corporate records. These were the first subpoenas issued by the United States Attorney's Office in the continental United States. These records were produced by the defendants and turned over to the prosecution. Many of the corporate files turned over to the prosecution were in a disorganized and deteriorated condition. Miss Lindemann and Postal Inspector Souder spent the month of November, 1961, cleaning the files, separating pages, organizing the files and determining the names and addresses of the clients. These files came from the basement of defendant Shea's house in Pennsylvania. Miss Lindemann correlated the corporate records of individual clients and transactions with the investigative reports which had been previously developed by postal inspectors. Late in November, 1961, Postal Inspector Burrows was unable to continue with the preparation of the case due to ill health, and he returned to retired status. Postal Inspector Souder thereafter assumed Inspector Burrows' duties.

As a result of the production of the corporate records, Miss Lindemann and Postal Inspector Souder wrote to hundreds of clients whose names were disclosed by these corporate records, in order to determine whether they possessed information necessary to the preparation of the case for presentation to the grand jury, and subsequently for trial. This required several weeks and on occasion, additional correspondence was necessary. During the period between October 9, 1961, and January 12, 1962, Miss Lindemann interviewed approximately one-hundred potential witnesses and potential defendants. During this period, she devoted her full time and attention to this case, working overtime and on holidays. Similarly, Inspector Souder worked full time on the preparation of this case from the date he was assigned to the case until January 12, 1962.

In November, 1961, the United States Attorney assigned Assistant United

States Attorney Donald S. Smith on a part-time basis to assist in the preparation of the case. In December, 1961, Mr. Smith was placed in charge of the prosecution and began full time participation in the preparation of the case. The assignment of a second Assistant United States Attorney to the case was necessitated by the vast number of exhibits, the size of the files and the number of witnesses involved.

The presentation of evidence before the grand jury in the instant case commenced on January 12, 1962. The grand jury heard evidence in the case on January 12, 19, 22, 23, 29, 30, 31, February 12 and March 13. A total of thirty-one witnesses appeared and testified during this time. Pursuant to a request of their counsel, defendant Hanrahan testified on January 30 and 31 and defendant Shea testified on February 12. Various co-defendants also testified, some of whom later appeared as witnesses at the trial on behalf of the government. On March 13, 1962, the grand jury voted a presentment and the indictment was returned on March 26, 1962. Between January 8, 1962 and March 28, 1962, the grand jury heard evidence in a total of 240 cases. Between January 12 and March 26, 1962, Mr. Smith and Miss Lindemann worked full time on the presentation of this case to the grand jury and the drafting of the indictment.

The Court is of the opinion that on the basis of the foregoing, and in view of all of the facts and circumstances of this case as spread upon its voluminous record, the prosecution of these defendants was not conducted with such disregard of their interests that it can be said that the delay resulted from deliberate, or negligent, actions on the part of the prosecutor. On the contrary, it is the opinion of the Court that under the circumstances of this case the delay which took place was necessary for a fair and just prosecution of the charges of mail fraud.

After the first indictment was transferred from Puerto Rico, and until October of 1960, when the government formally announced its intention to bring a second indictment, the Assistant United States Attorney assigned to the case discussed it with the Department of Justice and with the United States Attorney, researched questions of law involved, filed written motions and oppositions, and appeared in Court in matters pertaining to this case. It is apparent, however, that during the month of September, 1960, the United States was concerned with whether or not it could go to trial on the Puerto Rican indictment, and for that reason was not in a position to enter into extensive preparation for trial. Of course, during this time it would appear that the United States Attorney for the District of Puerto Rico was prepared for trial.

The defendants might contend that the dismissal of the first indictment was an attempt to relieve the government from its inability to go to trial within the time ordered by the Court on September 14, 1960. This is partially true. Certainly, the case as it then stood was fraught with difficulties, at least so far as the government was concerned, especially in regard to the language barrier and the problems it would cause in prosecuting the case in this District. The most feasible solution was to obtain a new indictment involving continental victims. However, it was not just inability to go to trial within the time specified that dictated obtaining a new indictment. Indeed, as first suggested by defense counsel, it would have been quite difficult for the government to prosecute the Puerto Rican case in the District of Columbia no matter when it went to trial.

From the time the United States decided to obtain a new indictment until January of 1961, the prosecutor was awaiting the completion of Inspector Burrows' investigation of the remaining one-hundred continental cases. This investigation apparently was more extensive than had originally been anticipated. Although it was originally estimated that this investigation would take about two weeks, the report was not finally received until some three months later, during which time Inspector Burrows retired

and Inspector Turner replaced him. The Court cannot find any evidence to indicate that the delay during this period was caused by deliberate or negligent acts.

Similarly, the delay which occurred between January, 1961, and the appointment of Miss Lindemann to work upon the case does not appear to have been deliberately or negligently caused. The defendants would make much of the fact that on many occasions the Department of Justice offered assistance to the United States Attorney in this matter. The defendants relate five such offers of assistance between June, 1960, and March, 1961. Aside from the fact that these seem to be part of the routine correspondence between the United States Attorney's Office and the Department of Justice, it appears that upon occasion, suggestions and advice were sought from, and that recommendations were made by, the Department of Justice. Obviously, some person would have to try this case and he alone could familiarize himself with it. Thus, although there were at least two offers of assistance during the period of January to March, 1961, it would appear that because of the difficulties in the United States Attorney's Office, little could be done on the case in preparation for trial. In the opinion of the Court, and based upon the whole record, the actions of the United States from January through March, 1961, were neither deliberately nor negligently productive of delay. Certainly, the loss of these two and one-half to three months was unfortunate, but the Court cannot place legal blame for this loss upon the government. Its action was not unreasonable under all of the circumstances of this case.

During April, 1961, Assistant United States Attorney Alexander worked full time on the case. In May and June, as indicated, he was reassigned to the Appellate Division. The Court does not find fault with the action of the United States Attorney here. His decision appears reasonable under the circumstances, as does the failure to assign another prosecutor to the case. One must always keep in mind that this was an extremely complicated case. It would be absurd to assign someone else to it when Mr. Alexander was expected to return, even assuming that someone else was available, which was not the fact.

After Mr. Alexander announced his resignation, and after an attempt to have the case assigned to him in the Department of Justice, the record indicates that the United States Attorney, faced with a lack of experienced personnel, employed Miss Lindemann to handle the case. From the time she came on the case and until its presentation to the grand jury, there was at least one Assistant United States Attorney working on the case. For some of this time there were two prosecutors so working. Furthermore, for the majority of this time there was at least one postal inspector assigned to and working on this case. For a while there were two postal inspectors working on it. The Court finds no deliberate or negligent delay during this period.

As indicated earlier, it is the opinion of the Court that under the unusual and complicated circumstances of this most involved case, the delays which took place were necessary for fair and just prosecution of the charges. These delays were not, under the circumstances of the case, caused by arbitrary, capricious, vexatious, oppressive, deliberate or negligent conduct on the part of the government.

### III  *Prejudice*

In its opinion, the Court of Appeals has indicated that

if * * * the court should find that the prosecution was conducted with such disregard of appellants' interests that it can be said that the delay resulted from deliberate, or at least negligent, actions on the part of the prosecutor and the prosecutor fails to show 'that the accused suffered no serious prejudice beyond that which ensued from the ordinary and inevitable delay,' then appellants' Sixth Amendment rights have been denied and the

convictions must be vacated and the indictments dismissed.[4]

While, as previously indicated, the Court is of the opinion that there was no deliberate, or negligent, delay in bringing the instant prosecution, it would appear appropriate to discuss the question of prejudice as well as that of delay.

The Sixth Amendment guarantee "is an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself."[5] This right, then, affords a dual protection against prejudice to a defendant's defense, and against prejudice to his person.[6]

The defendants' main contention as to damage suffered because of the delays in this case relates to their ability to defend themselves. In particular, the defendants point to the destruction of certain files of the Commercial Finance Service Corporation and the prejudice resulting from their loss. In October, or early November of 1959, the corporate files of clients in the continental United States were moved to the house of defendant Shea in Pennsylvania. Other corporate records, including the files of clients in Puerto Rico, their financial records and the files on lending institutions, had been moved to the offices of the defendants' attorney. Upon transferring the continental files to Pennsylvania, defendants Hanrahan and Shea, and co-defendants Norwood and Rossiter placed them in the basement of Mr. Shea's house, on some boards laid out on the dirt floor. In March or April of 1960, a drain was blocked and the basement of defendant Shea's house became flooded. Many of the files were soaked. The basement was full of water for four or five weeks. Apparently, defendant Shea made no effort to remove the files from the flooded area, or to dry them out or otherwise preserve

them, until October, 1960. At this time, defendants Shea and Hanrahan and co-defendants Rossiter and Norwood attempted to dry out these records, and it was discovered that a number of them were destroyed.

In the opinion of this Court, any difficulties experienced by the defendants due to the loss of these records cannot be attributed to the government. It appears clear that their destruction cannot be related in any causal manner to delays incident to the prosecution of this case. When the flood occurred which caused the ultimate destruction or damage to the files stored in Pennsylvania, the case was pending in Puerto Rico and the defendants were awaiting the outcome of their motion for change of venue. Certainly, the defendants could not complain that the time between their indictment in Puerto Rico and the flood in Pennsylvania was an unreasonable one, especially in view of the fact that two months at most before the flood the defendants were not prepared for trial.

It would appear that the files stored in Pennsylvania would have been useful in defending against the Puerto Rican charges as well as in the District of Columbia. Certainly, any favorable testimony of satisfied clients would have been relevant to the allegations of a scheme to defraud. Furthermore, because the statute of limitations had not run as to many of the continental cases, common sense would indicate that these files should be preserved especially in view of the fact that the defendants knew that their activities were being investigated. On the basis of the record in this case, the Court can only conclude that these records were destroyed by an act of God, to which the carelessness of the defendants contributed, and that the government was in no way responsible for their loss.

It is also questionable whether in fact the defendants suffered substantial prejudice by the loss of these records. Dur-

---

4. 121 U.S.App.D.C. 139, 348 F.2d 368.

5. United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 15 L.Ed.2d 627, 630 (1966).

6. See generally, Note, *The Lagging Right to a Speedy Trial*, 51 Va.L.Rev. 1587 (1965).

ing the pendency of the second indictment, the defendants had available to them the names and addresses of several hundred potential witnesses. Among them were over 400 persons representing more than 400 business firms who were clients of the defendants in the continental United States; 124 persons who were clients of the defendants in Puerto Rico and the Virgin Islands; 206 persons and firms who were lenders with whom the defendants had contacts and 29 former employees of the defendants' corporation. The names and addresses of all of these potential witnesses were found in the corporate records produced by the defendants. Furthermore, the addresses of all potential witnesses were furnished to the defendants' attorney by the prosecutor during the trial in all instances where specific requests were made. It is interesting to note also that in their motion for change of venue, the defendants alleged that many of the witnesses they intended to call at the trial resided in the continental United States, and that they were without funds to bring these witnesses to Puerto Rico for trial. The names and addresses of 28 persons residing in the continental United States were referred to in this motion, none of whom were called as witnesses at the trial. It would be reasonable to expect that at least as to these last mentioned potential witnesses, the defendants would have preserved any corporate records in their possession.

In October of 1961, defendant Hanrahan gave Assistant United States Attorney Lindemann a notebook. This notebook contained certain corporate records of Commercial Finance Service Corporation and commentary by defendant Hanrahan. While in the possession of the prosecution, Postal Inspector Souder made a photostat of the notebook, which photostat became government exhibit 186 at the trial. After the return of the indictment, the notebook was returned to defendant Hanrahan. This notebook contained the names and addresses of 74

persons in sections defined as rejections and refunds. These names and addresses were available to or in the possession of the defendants at all times prior to the trial, although the corporate files for about 49 of the 74 alleged clients had apparently been destroyed in Mr. Shea's basement, and in about 22 instances there was no evidence to show that they were clients or that they had received money from the defendants. However, in preparation for the trial, the defendants attempted to contact only one of these allegedly favorable witnesses, notwithstanding the availability of all of their names and addresses. The conclusion is obvious that although the defendants were without a number of their corporate files, they were not without access to a substantial number of witnesses whose testimony they claimed would be favorable to them, but that either no attempt was made to call them or they were never contacted prior to trial. This is most interesting in light of the defendants' allegation in their motion for change of venue that many of their witnesses resided in the continental United States.

In their brief on appeal, the defendants argued that numerous witnesses were unable to recall events or to produce records. They mentioned Mr. Webb's loss of records, loss of memory by government witnesses Clark, Silverman, and Futtrup, and the loss of Mr. Burke's testimony.[7] At the instant hearing, the defendants again mentioned the loss of memory and records by Mr. Webb. Apparently, Mr. Webb's wife had been taken ill and was confined to a hospital in New Mexico. Her condition was quite serious and to make her think she might be getting well, Mr. Webb kept sending her his records and other things in an attempt to encourage her to retain her interest in his affairs. In the spring of 1960, Mrs. Webb was transferred from New Mexico to a hospital in New York. She died in New York in October of 1960. Mr. Webb's records were lost at about the time of the transfer of Mrs. Webb from

7. Brief for Appellant, pp. 5–6. Hanrahan v. United States, 121 U.S.App.D.C. 134, 348 F.2d 363 (1965).

New Mexico to New York, apparently in the spring of 1960.[8] Obviously, these records were lost either while the case was in Puerto Rico or soon after its transfer to the District of Columbia. It is the Court's opinion that any prejudice resulting from the loss of these records could not be attributed to delay in the prosecution of this case. No substantial delay had taken place, prior to the loss of these records, which could in any way be attributed to the government.

During the course of the remanded hearing, defendant Hanrahan, through his counsel, attempted to introduce evidence to the effect that his wife suffered a mental breakdown and that this had an effect upon him.[9] The Court will assume that the families of all of the defendants suffered during this prosecution and that naturally this affected the various defendants. Certainly every defendant subject to prosecution will undergo some hardship, including anxiety and loss of income. The question is always one of degree. However, this is something these defendants should have taken into consideration before embarking upon the scheme of which they stand convicted. Furthermore, it is apparent that during the entire period from the institution of the prosecution in Puerto Rico until the completion of the trial in the District of Columbia, these defendants were enlarged upon bond.

During the trial of this case, it was ascertained that one of the defendants, Francis Burke, was confined in the psychiatric ward of New Rochelle Hospital, New Rochelle, New York. Accordingly, in April of 1963, a mistrial was declared as to this defendant. Later, on November 6, 1963, Judge Youngdahl granted defendant Burke's motion to dismiss the indictment against him for lack of a speedy trial. In so doing, he indicated that Burke's precarious mental condition would have made trial oppressive. Noting that this defendant was merely one of the selling agents for the group of men behind the alleged fraud, the Court pointed out that "the interest of society in punishing this particular individual at this time is slight—especially in view of the emotional punishment which the defendant has already received."[10] The considerations which led to the dismissal of the indictment against defendant Burke do not require dismissing the indictment as to these defendants. There is absolutely no indication that they have suffered hardship anywhere near as severe as suffered by Burke, nor was there any proffer to that effect. Furthermore, as distinguished from the *Burke* case, the interest of society in punishing these defendants is by no means slight, as they were the instigators and perpetrators of the scheme to defraud.

Finally, we come to the loss of memory by the various witnesses, and the loss of defendant Burke's testimony due to his emotional breakdown. It is difficult to estimate to exactly what degree the defendants were harmed by the failure of witnesses to remember certain facts. However, upon an examination of the record, the Court is of the opinion that this damage is not of such a serious nature as to compel dismissal of the indictment. It is then the opinion of the Court that on the whole record of this case, and taking into consideration all of the circumstances, the government has demonstrated that the defendants suffered no serious prejudice as a result of the delays which did not ensue from the ordinary and inevitable delay.

For the foregoing reasons, and based upon the entire record of this case, the Court is of the opinion that the defendants have not been deprived of their Sixth Amendment right to a speedy trial. Furthermore, the Court is of the opinion that no unnecessary delay under Rule 48(b)[11] is present which would require the Court, in the exercise of its discretion, to dismiss the indictment.

8. See 15 Trial Transcript 1707–1726.

9. See Hearing Transcript, pp. 1060–1073.

10. United States v. Burke, 224 F.Supp. 41, 47 (D.D.C.1963).

11. Fed.R.Crim.P. 48(b).